UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF NEW YORK

SARA K. ALEXANDER,

           Plaintiff,

-vs-               DECISION AND ORDER

STATE UNIVERSITY OF NEW YORK AT   10-CV-6681-CJS-JWF
BUFFALO,

           Defendant.

**APPEARANCES**

For Plaintiff:       Arthur H. Ackerhalt, Esq.
           Bruce A. Goldstein, Esq.
           Goldstein, Ackerhalt & Pletcher, LLP
           70 Niagara Street Suite 200
           Buffalo, NY 14202

           Jonathan Feldman, Esq.
           Empire Justice Center
           One West Main Street Suite 200
           Rochester, NY 14614

For Defendant:      J. Richard Benitez, A.A.G.
           New York State Attorney General's Office
           144 Exchange Boulevard, Suite 200
           Rochester, NY 14614

**INTRODUCTION**

**Siragusa, J.** Plaintiff is a former student at the State University of New York at Buffalo ("Defendant") who asserts she has a hearing impairment and who withdrew from the university. She alleges that Defendant failed to provide her with reasonable accommodations, and that such failure constituted a violation of the Americans with Disabilities Act ("ADA"). The matter is now before the Court on Defendant's motion for

summary judgment. For the reasons stated below, Defendant's application, ECF No. 18, is denied.

## BACKGROUND

Unless otherwise noted, the following are the undisputed facts of this case taken from the parties' statements[1] pursuant to W.D.N.Y. Loc. R. Civ. P. 56, viewed in the light most-favorable to Plaintiff. Plaintiff contends[2] that she has a severe hearing impairment and has worn bilateral hearing aids since she was four years old. She relies on oral communication instead of sign language and is an excellent lip reader.

In December 2008, Plaintiff was accepted into Defendant's School of Nursing. In June 2009, Plaintiff's mother sent an email to the Office of Disability Services ("ODS") informing that office that Plaintiff's "primary concerns are a note taker, preferential seating and an FM system for lectures and assistance with exams." Expert Witness Report for Richard Benitez regarding complaint entitled Sara K. Alexander vs. State University of New York, Findings and Impressions ¶ 1, Sept. 19, 2012. ECF No. 18-2. While in high school, Plaintiff was given the accommodations she requested of Defendant and had so informed Defendant through her admissions essay.

On July 10, 2009, Plaintiff and her mother met with Randall Borst ("Borst"), Defendant's Director of Disability Services, and they discussed accommodations for Plaintiff. ODS provided Plaintiff with two memoranda to present to faculty. ODS also approved the following accommodations for Plaintiff: (1) extended time on tests and use

---

[1]Defendant's Rule 56 Statement was captioned with the name of another case; on December 17, 2012, Defendant filed a corrected copy, ECF No. 23, with the correct caption.

[2]In addition to filing an opposing statement as required by Loc. R. 56(a)(2), Plaintiff also filed her own statement of facts.

of alternate test location; (2) preferential seating; (3) FM Loop; and (4) Note-takers.

At the meeting with Borst, Plaintiff was informed that Defendant had an FM system, but, as later discovered, that the system did not function. Subsequently, Borst offered to provide Plaintiff with an accommodation called "C-Print." Borst described C-Print as a system that required an operator to type every word spoken in class, and he assured Plaintiff the C-Print system would be provided to her regardless of the cost. Later, Plaintiff learned that what Borst described as C-Print was, in actuality, a service called "CART."[3] CART involves a reporter creating a verbatim transcript of what is being said in class in real time. She also learned that C-Print was a similar process, but involved a reporter *paraphrasing* everything being said in class in real time.

In any event, Plaintiff's mother sent an email summarizing what Borst had offered (verbatim, real time transcript) and she suggested that ODS contact the New York State Department of Education, Office of Vocational and Educational Services for Individuals with Disabilities ("VESID") to inquire whether the cost could be shared. In the email, Plaintiff's mother also specified the type of FM system Plaintiff needed—one that would work well with her hearing aids. As to CART, there is a dispute as to whether Plaintiff declined the service.

On July 21, 2009, Plaintiff's mother sent ODS a letter from Plaintiff's high school audiologist regarding her need for an FM system. On August 6, 2009, Plaintiff's mother inquired of ODS whether the FM system had been ordered and the status of note taking services. On August 7, 2009, Borst sent an email to Plaintiff's mother stating that

---

[3]The acronym stands for computer-assisted realtime transcripts. Borst Dep. 33:1–2.

Defendant was working with Deaf Adult Services to find a C-Print specialist.[4] Plaintiff's mother followed up with another email to ODS. On August 24, 2009, Borst sent an email to Amy Daniels ("Daniels") of ODS stating that there were no C-Print typists in the area, but that they were used a lot in Rochester.[5] Plaintiff points out that the email from Borst to Daniels did not indicate that Borst had decided not to pursue locating a C-Print stenographer, and did not disclose that C-Print could be provided remotely with the stenographer not in the classroom.

On August 19, 2009, Plaintiff's mother sent an email to Daniels to determine whether the FM system had been ordered, and on August 20, Daniels confirmed that it had. On August 30, 2009, though, Defendant informed Daniels that the FM system was back ordered. Plaintiff was told she should sit closer to her professors. Classes began the next day, August 31. It should be noted that Plaintiff claims that Borst has provided FM systems to other hearing impaired students.

After classes began, Plaintiff and her mother complained two or three times a week to Defendant that the agreed upon accommodations were not being provided. In fact, the promised FM system did not arrive until three weeks after classes started. Plaintiff argues that as a result, she received a bad grade in her first test in Anatomy. Plaintiff also contends that she needed the FM system in her psychology class as well, where there was no note taker and the professor had a heavy accent.

---

[4]Plaintiff points out that at the time of his deposition, Borst stated this was untrue.

[5]Rochester, New York, is located 80 miles to the east of Buffalo, New York.

Plaintiff states that she passed out the memoranda ODS gave her and the professors in her classes solicited volunteer peer note takers for her. However, Plaintiff contends that peer note takers, unlike professionally trained note takers, often take notes to trigger their own memories of what was being said in class and that this did not help Plaintiff, since "she never heard what was being said to begin with." Pl.'s Rule 56 Statement of Facts ¶ 76. Unlike her other classes, the peer note taker in her nursing class were helpful because the note taker knew that she needed to take down what was being said. Plaintiff states she received a grade of A in her nursing class, which was the smallest of her classes having approximately 125 students. Plaintiff's other classes were larger, with her largest class consisting of approximately 400 students.

Plaintiff also states that her needed accommodation of sitting in the front of the class was not honored. Professors sometime arrived to class late and would begin instruction without asking students to leave a seat open in front for Plaintiff. Plaintiff's professor in World Civilization told her that if she wanted a seat closer to the front, she needed to arrive earlier, but Plaintiff claims this was not always feasible. Because of poor grades, Plaintiff's Anatomy professor encouraged her to withdraw from the class, which she did. She eventually withdrew from all but her nursing class (in which as indicated she received a grade of A), and withdrew altogether from the university in December 2009 because of Defendant's lack of accommodations.

Plaintiff enrolled in Monroe Community College ("MCC") in January 2010 and graduated with a Liberal Arts in Science degree in December 2011. MCC provided Plaintiff with an FM system, a separate location for testing, preferential seating, a note taker and extended time to take tests. As a result, she asserts she received good grades. In January

2012, Plaintiff enrolled in St. John Fisher's School of Nursing ("Fisher") and states that Fisher is also providing needed accommodations to her.

Plaintiff's complaint sets out two claims for relief: (1) Defendant's conduct in failing to provide Plaintiff with reasonable accommodations constitutes discrimination on the basis of disability in violation of Title II of the ADA and its implementing regulations; and (2) Defendant's failure to provide Plaintiff with reasonable accommodations due to her hearing impairment constitutes discrimination on the basis of disability in violation of 29 U.S.C. § 794 (section 504) and its implementing regulations.

## STANDARDS OF LAW

### *Rule 56*

Summary judgment may not be granted unless "the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law." Fed. R. Civ. P. 56(c). A party seeking summary judgment bears the burden of establishing that no genuine issue of material fact exists. *See, Adickes v. S.H. Kress & Co.*, 398 U.S. 144, 157 (1970). "[T]he movant must make a prima facie showing that the standard for obtaining summary judgment has been satisfied." 11 MOORE'S FEDERAL PRACTICE, § 56.11[1][a] (Matthew Bender 3d ed.). "In moving for summary judgment against a party who will bear the ultimate burden of proof at trial, the movant may satisfy this burden by pointing to an absence of evidence to support an essential element of the nonmoving party's claim." *Gummo v. Village of Depew*, 75 F.3d 98, 107 (2d Cir. 1996)(*citing Celotex Corp. v. Catrett*, 477 U.S. 317, 322-23 (1986)), cert denied, 517 U.S. 1190 (1996). Once that burden has been established, the burden shifts

to the non-moving party to demonstrate "specific facts showing that there is a genuine issue for trial." Fed. R. Civ. P. 56(e); *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 250 (1986). To carry this burden, the non-moving party must present evidence sufficient to support a jury verdict in its favor. *Anderson*, 477 U.S. at 249. The parties may only carry their respective burdens by producing evidentiary proof in admissible form. Fed. R. Civ. P. 56(e). The underlying facts contained in affidavits, attached exhibits, and depositions, must be viewed in the light most favorable to the non-moving party. *U.S. v. Diebold, Inc.*, 369 U.S. 654, 655 (1962).

Summary judgment is appropriate only where, "after drawing all reasonable inferences in favor of the party against whom summary judgment is sought, no reasonable trier of fact could find in favor of the non-moving party." *Leon v. Murphy*, 988 F.2d 303, 308 (2d Cir.1993).

### *Americans With Disabilities Act*

Plaintiff's first cause of action is made pursuant to the ADA. In that regard, the general legal principles applicable to ADA disability discrimination claims are clear:

> The ADA, which serves to protect the rights of individuals with disabilities, states that a disabled individual is one who suffers from "a physical or mental impairment that substantially limits one or more of the major life activities of such individual." 42 U.S.C. § 12102(2)(A) (2000). Title II of that Act proscribes discrimination against the disabled in access to public services. Section 202 states "No qualified individual with a disability shall . . . be excluded from participation in or be denied the benefits of the services, programs, or activities of a public entity, or be subjected to discrimination by any such entity." *Id*. § 12132. A qualified individual with a disability is defined as a disabled person who, whether or not given an accommodation, "meets the essential eligibility requirements for the receipt of services or the participation in programs or activities provided by a public entity." *Id*. § 12131(2). Title II applies to any state or local government or instrumentality of a state or local government. *Id*. § 12131(1).

*Powell v. Nat'l Bd. of Med. Exam'rs*, 364 F.3d 79, 84-85 (2d Cir. 2004).

### *Section 504 of the Rehabilitation Act of 1973*

Plaintiff's second claim is made under section 504 of the Rehabilitation Acto fo 1973, codified in part at 29 U.S.C. § 794, which provides in pertinent part as follows:

> No otherwise qualified individual with a disability in the United States, as defined in section 7(20) [29 U.S.C. § 705(20)], shall, solely by reason of her or his disability, be excluded from the participation in, be denied the benefits of, or be subjected to discrimination under any program or activity receiving Federal financial assistance….

29 U.S.C.S. § 794(a). "[S]ection 504 is enforceable through Title VI of the Civil Rights Act of 1964, which provides (*inter alia*) for the termination of federal financial assistance to recipients who discriminate in violation of section 504." *Rivera v. Heyman*, 157 F.3d 101, 104 (2d Cir. 1998).

> To establish a prima facie violation of section 504, a plaintiff must prove that: 1) he or she is a "handicapped person" as defined in the Rehabilitation Act; 2) he or she is "otherwise qualified" to participate in the offered activity or to enjoy its benefits; 3) he or she is being excluded from such participation or enjoyment solely by reason of his or her handicap; and 4) the program denying the plaintiff participation receives federal financial assistance. *Doe v. New York Univ.*, 666 F.2d at 774-75. Once a prima facie violation of section 504 has been established, "the defendant must present evidence to rebut the inference of illegality." *New York State Ass'n for Retarded Children v. Carey*, 612 F.2d 644, 649 (2d Cir. 1979)….

*Rothschild v. Grottenthaler*, 907 F.2d 286, 289-290 (2d Cir. 1990).

## ANALYSIS

### *Sovereign Immunity*

Defendant's first argument is that Plaintiff's ADA claims are barred by sovereign immunity. Defendant recognizes the holding in *United States v. Georgia*, 546 U.S. 151, 159 (2006), that "insofar as Title II creates a private cause of action for damages against the States for conduct that actually violates the Fourteenth Amendment, Title II validly

abrogates state sovereign immunity." However, Defendant contends that no violation of the Fourteenth Amendment occurred, since a citizen is not constitutionally entitled to higher public education, citing to *Johnson v. Southern Connecticut State Univ.*, No. CIVA3:02-CV-2065(CFD), 2004 WL 2377225 (D. Conn. Sept. 30, 2004) ("The Supreme Court has repeatedly held that the right to an education is neither explicitly nor implicitly guaranteed in the Constitution, and as such, cannot be considered 'fundamental.'"). Although Plaintiff maintains that the issue of whether Title II of the ADA abrogates sovereign immunity of the states is an open question in the Second Circuit, she nonetheless concedes her ADA cause of action. In that regard, she contends that the motion can be decided on the section 504 claim alone, and that summary judgment is not appropriate on that second cause of action.

***Section 504 Claim***

Defendant has admitted in its answer that it accepts federal funds. Answer ¶ 5; Compl. ¶¶ 9, 10 & 11.[6] Plaintiff argues that Defendant has not contested two other factors of the *Rivera v. Heyman* discrimination test, set forth above, specifically that she is a handicapped person and that she is otherwise qualified to participate in Defendant's education program. Consequently, Plaintiff maintains that the only dispute is whether Defendant discriminated against her.[7] As to this factor, Plaintiff contends that material

---

[6]Defendant's Answer "[d]enies knowledge or information as to allegations" contained in paragraphs 10 and 11 of the complaint, which are that Defendant is subject to section 504 (¶ 10) and provides educational and related programs to its students and members of the public and is required to comply with section 504.

[7]In its Reply Memorandum of Law at 2, ECF No. 21, Defendant concedes that section 504 applies to it and, for the purposes of the present motion, assumes Plaintiff is a qualified individual within the meaning of section 504, *id.* at 3.

issues of fact exist precluding summary judgment.

Preliminarily, as to sovereign immunity, Plaintiff argues that this Court should follow the lead of Chief Judge Skretny and his decision in *Blasio v. New York State Dep't of Correctional Services*, No. 04-CV-653S, 2005 WL 2133601 (W.D.N.Y. Aug. 31, 2005). In *Blasio*, Chief Judge Skretny wrote, "By continuing to accept federal funds after *Garcia*, however, New York knowingly waived its immunity for Rehabilitation Act claims, which are based on post-*Garcia* events." *Id*. at *3. In *Garcia v. S.U.N.Y. Health Sciences Center of Brooklyn*, 280 F.3d 98, 114–15 (2d Cir. 2001), the Second Circuit determined that, "Garcia's § 504 damage claim against New York fails because New York had not knowingly waived its sovereign immunity from suit." In the present case, all the events are post-*Garcia*, that is, post 2004. Consequently, the Court is persuaded that New York, by accepting federal funds after the *Garcia* decision, has waived sovereign immunity for damage suits brought under section 504 of the Rehabilitation Act of 1973.

As to her contention of discrimination, Plaintiff argues that she has established that Defendant was deliberately indifferent to her rights under section 504. In *Bartlett v. New York State Bd. of Law Exam'rs*, 156 F.3d 321, 331 (2d Cir. 1998), the Second Circuit stated that "[a] plaintiff aggrieved by a violation of the ADA or the Rehabilitation Act may seek Title VI remedies." The Court of Appeals went on to say:

> In the context of the Rehabilitation Act, intentional discrimination against the disabled does not require personal animosity or ill will. *See Rambo v. Director, Office of Workers' Compensation Programs*, 118 F.3d 1400, 1406 (9th Cir. 1997) (citing *Oxford House-C v. City of St. Louis*, 843 F. Supp. 1556, 1577 (E.D. Mo. 1994)). Rather, intentional discrimination may be inferred when a "policymaker acted with at least deliberate indifference to the strong likelihood that a violation of federally protected rights will result from the implementation of the [challenged] policy . . . [or] custom." *Ferguson v.*

> *City of Phoenix*, 931 F. Supp. 688, 697 (D. Ariz. 1996) (internal quotation marks and citations omitted) (first alteration in original); *see also Canton v. Harris*, 489 U.S. 378, 385, 103 L. Ed. 2d 412, 109 S. Ct. 1197 (1989).

*Bartlett*, 156 F.3d at 331. The Second Circuit's decision in *Bartlett* was vacated by the Supreme Court, *New York State Bd. of Law Exam'rs v. Bartlett*, 527 U.S. 1031 (1999), but on remand from that Court, the Second Circuit continued to hold that the standard for a violation of section 504 was deliberate indifference, *see Bartlett v. New York State Bd. of Law Exam'rs*, 226 F.3d 69 (2d Cir. 2000). The issue at the Supreme Court was whether the plaintiff's dyslexia constituted a disability, an issue not present here. Disability is defined as, "a physical or mental impairment that substantially limits one or more of the major life activities." 42 U.S.C. § 12102(2)(A). The regulation promulgated by the United States Department of Labor under the ADA states that, "[t]he phrase major life activities means functions such as caring for one's self, performing manual tasks, walking, seeing, hearing, speaking, breathing, learning, and working." 28 C.F.R. § 35.104. Thus, if Plaintiff can prove that her hearing impairment substantially limits learning, then she will have proven she suffers from a disability.

Turning to the deliberate indifference standard, Plaintiff argues that the standard requires her only to prove that Defendant knew that a harm to her federally protected right was substantially likely, and that it failed to act upon that likelihood after notice by Plaintiff of the accommodations needed. *Duvall v. County of Kitsap*, 260 F.3d 1124, 1139 (9th Cir. 2001). "'It is not necessary to prove that the defendant fully appreciated the harmful consequences of that discrimination ... [i]nstead, deliberate indifference can be found when the defendant's response to known discrimination 'is clearly unreasonable in light of the known circumstances.'" *Preston v. Hilton Cent. School Dist.*, No. 11-CV-6420L, 2012 WL

2829452, *5 (W.D.N.Y. Jul. 11, 2012) (quoting *Gant v. Wallingford Bd. of Educ.*, 195 F.3d 134, 141 (2d Cir. 1999) (addressing peer-on-peer harassment claim under Title IX), quoting *Davis Next Friend LaShonda D. v. Monroe County Bd. of Educ.*, 526 U.S. 629 U.S. at 648 (1999)).

In its initial memorandum of law, Defendant agreed that the deliberate indifference standard governs. Def.'s Mem. of Law at 6. However, Defendant contended that it provided Plaintiff with two memoranda to present to faculty, and that it approved the accommodations Plaintiff requested. Defendant further maintains that, although the implementation of those approved accommodations was delayed, Plaintiff can not establish that Defendant knew of and disregarded an excessive risk of harm to her. *Id.* at 6–7.

In its reply memorandum of law, though, Defendant argues that, "[u]nder the deliberate indifference standard, the discrimination must be intentional." Def.'s Reply Mem. of Law at 1. It cites *Loeffler v. Staten Island Univ. Hosp.*, 582 F.3d 268, 275 (2d Cir. 2009) in support. In *Loeffler*, the Court of Appeals stated:

> A plaintiff aggrieved by a violation of the RA may seek all remedies available under Title VI of the Civil Rights Act of 1964 (42 U.S.C. § 2000d *et seq.*), including monetary damages. See 29 U.S.C. § 794a(a)(2). However, monetary damages are recoverable only upon a showing of an intentional violation. *See Bartlett*, 156 F.3d at 331 ("The law is well settled that intentional violations of Title VI, and thus the ADA and the Rehabilitation Act, can call for an award of money damages.").
>
> The standard for intentional violations is "deliberate indifference to the strong likelihood [of] a violation:" "[i]n the context of the Rehabilitation Act, intentional discrimination against the disabled does not require personal animosity or ill will. Rather, intentional discrimination may be inferred when a 'policymaker acted with at least deliberate indifference to the strong likelihood that a violation of federally protected rights will result from the implementation of the [challenged] policy . . . [or] custom.'" *Bartlett*, 156 F.3d

at 331 (internal citations omitted). *See also Duvall v. County of Kitsap*, 260 F.3d 1124, 1138-39 & n.13 (9th Cir. 2001).

*Loeffler*, 582 F.3d at 275.

Defendant cites to *Farmer v. Brennan*, 511 U.S. 825, 835 (1970), to argue that "deliberate indifference has a subjective element that requires more than negligence but less than 'acts or omissions for the very purpose of causing harm or with knowledge that harm will result.'" Def.'s Reply Mem. of Law at 4 (quoting *Farmer*). Defendant also relies on an Eighth Amendment deliberate indifference to a serious medial need case to argue here that, "[t]he subjective element requires a state of mind that is equivalent to criminal recklessness." Def.'s Reply Mem. of Law at 4 (citing *Hathaway v. Coughlin*, 99 F.3d 550, 553 (2d Cir. 1996).

The Court disagrees with the argument that Plaintiff must show the equivalent of criminal recklessness to prevail under section 504. Rather, the Court is guided by the Second Circuit's direction in *Loeffle*r:

> We have not defined "deliberate indifference" in this context. In *Gebser v. Lago Vista Indep. School Dist.*, 524 U.S. 274, 290-91, 118 S. Ct. 1989, 141 L. Ed. 2d 277 (1998), the Supreme Court interpreted "deliberate indifference" in the context of sexual harassment claims under Title IX of the Education Amendments of 1972, as amended, 20 U.S.C. §§ 1681 *et seq*. Nothing suggests that the standard for damages under the RA [Rehabilitation Act] is the same, but it is at least instructive that *Gebser* described the requirements of deliberate indifference as follows: [A]n official who at a minimum has authority to address the alleged discrimination and to institute corrective measures on the recipient's behalf has actual knowledge of discrimination in the recipient's programs and fails adequately to respond. *Id*. at 290. In a separate context, we have also said that deliberate indifference must be a "deliberate choice . . . rather than negligence or bureaucratic inaction." *Reynolds v. Giuliani*, 506 F.3d 183, 193 (2d Cir. 2007) (citing *Pembaur v. Cincinnati*, 475 U.S. 469, 483-84, 106 S. Ct. 1292, 89 L. Ed. 2d 452 (1986)).

*Loeffler*, 582 F.3d 275–76.

Well before school started, Plaintiff alerted Defendant about her hearing impairment and necessary accommodations. Borst promised he would provide those accommodations requested. For example, Borst promised a verbatim transcript of the class proceedings in real time. Undisputed is that real time capturing services were never provided.[8] Borst promised an FM system compatible with Plaintiff's hearing aids. The system did not exist until three weeks into classes, too late to assist Plaintiff with her first exams. Plaintiff asked for a paraprofessional note taker.[9] None was provided, and the volunteer note takers in some of Plaintiff's classes made notes that were inadequate or incomplete. Borst promised preferential seating so Plaintiff could use her lip reading skills to understand the professors. Preferential seating was provided only sporadically. Defendant's failure to provide accommodations for the first three weeks of class resulted in Plaintiff's withdrawing from all but one class to avoid having F grades. At his deposition, Borst was asked the following questions and made the following responses:

> Q. Okay. Was there any request for an accommodation made by either Sara Alexander or her mother that you determined to be an unreasonable accommodation?
>
> A. I did not determine the accommodation to be unreasonable. I determined the method by which they wanted it to be filled to be unreasonable because I believed it would have a high probability of being ineffective primarily and—and because it would be administratively impossible for me to have done.
>
> Q. Okay. Can you please explain what you mean?

---

[8]Borst contends that Plaintiff rejected his offer to provide CART. Borst Dep. 108:2–5.

[9]Plaintiff's mother testified that during her discussion of a note taker, when Borst brought up the C-Print system, she "thought that would be great; it would eliminate the need of a note taker." Susan Alexander Dep. 19:13–14.

A. Yes. They wanted the auxiliary aid of course notes, course lecture notes, which is certainly a reasonable accommodation. It is a required auxiliary aid. But the way that they wanted it to be performed, and when I say "they, If the parent did most of the advocating as I recall but in Sara's behalf, they asked that I hire the same person who had been her full-time notetaker aide through high school....

Q. Other than that request, was there any other request that you believed that the implementation of that request would be unreasonable?

A. No, sir.

Borst Dep. 26:19–27:18, 28:1–5. Defendant contends that Plaintiff and her mother rejected the offer to provide a verbatim or summarized transcript of all classes. However, Plaintiff's mother testified as follows at her deposition concerning her conversation with Borst:

A. He did not mention the term "CART" at all at the meeting. All he said was the person would be sitting in the back of the class. Sara would have a computer on her desk. The person would be taking down everything the instructor said, everything any of the other kids in class said. If it was a lecture setting, Sara would be able to read it right on her screen. I said, "That would be great." I said, "That would alleviate the need of a note taker,"

Q. Now if CART would have been offered to you—I mean, you just don't have a recollection that that was the case, I mean, from what you're telling me today.

A. I would have accepted either.

Q. That was my next question.

A. I would never turn services down for my daughter. I would accept either. Whatever they could get in place by the first day of school so she would have a good chance to succeed I would have accepted.

Susan Alexander Dep. 40:3–19. In contrast to Plaintiff's mother's testimony is Borst's deposition testimony on CART:

A. Yes. Well, during that time, I looked into—since Ms. Alexander had said at the meeting with me on or about July 10th, she had said to me that she did not want CART emphatically and so I was looking for something that would provide her with information from the class that she could read.

> You know, I thought, well, she doesn't want CART, maybe she would prefer C-Print because it's meaning for meaning rather than word for word, maybe she would consider that something more akin to notes, which as I say, I learned later it really doesn't work that way, but I checked with Deaf Adult Services, which is our local contractor for auxiliary aid services for deaf students.
>
> Q. When did you do that?
>
> A. Sign language—pardon?
>
> Q. When did you do that?
>
> A. Between July 10th and August 27th or so. I don't know the exact dates, but it was—it would have been as soon after July 10th as I could possibly do it.

Borst Dep. 99:14–100:12. Once Borst learned from Defendant's contractor for deaf services that it did not provide C-Print or paraprofessional note takers, and thinking that Plaintiff had rejected CART, he testified that, "I didn't pursue C Print any further. I didn't pursue paraprofessional notetakers any further. Our contractor didn't provide it. They're authorities on deaf services. And so that would have been all I did." Borst Dep. 102:6–10.

As a result of Borst's decision not to provide CART, C-Print, or paraprofessional note takers, Plaintiff contends she was excluded from the participation in, denied the benefits of, or was subjected to discrimination contrary to section 504. Both sides have submitted expert reports in support of their positions. After reviewing the evidentiary proof submitted on the pending motion, the Court concludes that material issues of fact exist which preclude issuance of summary judgment. Fed. R. Civ. P. 56(a).

## CONCLUSION

For the foregoing reasons, Defendants' motion for summary judgment, ECF No. 18, is denied. The Court will issue a separate pretrial order.

SO ORDERED.

Dated: February 27, 2013
Rochester, New York

ENTER:

/s/ Charles J. Siragusa
CHARLES J. SIRAGUSA
United States District Judge